# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| TERRI L. ANDREWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 3:05-0033** |
| v. | ) | **Judge Nixon / Knowles** |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's "Motion for Judgment Upon the Administrative Record." Docket Entry No. 9. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 13.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Judgment Upon the Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

## I. INTRODUCTION

Plaintiff filed her application for SSI on April 18, 2002, and her application for DIB on May 8, 2002, alleging that she had been disabled since September 21, 2001, due to "severe depression," "thoughts of hurting someone at work," "obsessive compulsive disorder," "serious panic attacks," and "numbness" and "weakness" in her right arm.[1]  Docket Entry No. 7, Attachment ("TR"), TR 27; 87-88; 107-115; 385-387.  Plaintiff's applications were denied both initially (TR 85-86; 388-389) and upon reconsideration (TR 87-88; 394-395).  Plaintiff subsequently requested (TR 99-100) and received (TR 35-38) a hearing.  Plaintiff's hearing was conducted on October 3, 2003, by Administrative Law Judge ("ALJ"), Mack, H. Cherry.  TR 43-84.  Plaintiff and vocational expert ("VE"), Jane Brenton, appeared and testified.  *Id.*

On March 24, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 24-34.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3.  The claimant has "severe" impairments including depression, generalized anxiety, and a history of alcohol abuse and benzodiazepine (BDZ) problems.
>
> 4.  These medically determinable impairments do not meet or

_____

[1]Plaintiff signed both applications, but dated the "DIB" application with "4/25/02" and the "SSI" application with "4/25/01."  TR 109; 387.  Plaintiff alleged "numbness" in her left arm as an additionally disabling condition for purposes of her reconsideration.  TR 87-88.

2

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform the mental demands of unskilled work at all exertional levels with the additional restrictions as indicated above.

7. The claimant is unable to perform any of her past relevant work, per VE testimony.

8. The claimant is a "younger" individual.

9. The claimant has a high school education.

10. Transferability of skills is not material to the decision.

11. Using Medical-Vocational Rule 204.00 as a framework for decision-making, there are a significant number of jobs in the State of Tennessee regional economy that she could perform. Examples and numbers as cited above.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 33-34.

On May 6, 2004, Plaintiff filed a letter requesting review of the hearing decision (TR 19-20) and requesting an extension of time (TR 19). On July 1, 2004, the Appeals Council issued a letter declining to review the case. TR 16-18. On September 28, 2004, the Appeals Council set aside its earlier action denying review. TR 11-12. After reviewing Plaintiff's case, on November 18, 2004, the Appeals Council issued another letter declining to further review the case (TR 6-9), thereby rendering the decision of the ALJ the final decision of the Commissioner.

3

This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to "severe depression," "thoughts of hurting someone at work," "obsessive compulsive disorder," "serious panic attacks," and "numbness" and "weakness" in her right arm. TR 27; 87-88; 107-115; 385-387.

On August 28, 1989, Dr. S. Castellani treated Plaintiff for "Depression and disturbing fantasies."[2] TR 173. Along with sexual fantasies, Plaintiff had a "fantasy of attacking her mother with a knife." *Id.* Dr. Castellani stated that Plaintiff reported having a "headache for the past few days, bi-frontal and extending into the neck." TR 174. Dr. Castellani's diagnoses were: "Major depression, recurrent"; "Rule out post traumatic stress disorder"; and "Rule out any psychotic disorder (doubtful)." *Id.* Dr. Castellani outlined a treatment plan: "Maintain in a safe, structured hospital environment, with support and alliance building"; "Brief psychotherapy to deal with some of the dynamic roots of the patient's fantasies, coupled with development of coping skills for these fantasies"; and "Trial of an antidepressant medication." TR 175.

On August 29, 1989, Dr. Castellani treated Plaintiff for her depression. TR 171. He noted Plaintiff's report that she had "never contemplated suicide until just recently" and that she had "no idea why she began to get depressed." *Id.* Plaintiff also reported that she had headaches, but that it was "unusual for her to have headaches," and that she felt "fatigued." *Id.*

---

[2] Dr. Castellani's first name is unknown.

Case 3:05-cv-00033   Document 14   Filed 06/20/06   Page 4 of 40 PageID #: 4

Upon physical examination, Dr. Castellani observed that Plaintiff had no physical problems. TR 172.

On September 4, 1989, Dr. Castellani evaluated Plaintiff "based upon findings obtained with the MMPI Rorschach, Sentence Completions Tests, Bender-Gestalt Visual-Motor Test, and correlated interview." TR 176. Dr. Castellani stated that Plaintiff manifested "a number of problematic tendencies of a magnitude that warrants consideration" and that her "problems with chronic depression appear to be primarily reactive in nature." TR 176-177. Dr. Castellani suggested that Plaintiff should receive treatment "periodically over a period of years for the possible emergence of biogenic factors that dispose her towards recurrent and unremitting depressions." TR 177.

On September 14, 1989, Dr. Castellani noted that Plaintiff had reported experiencing "worsening depression as well as very disturbed fantasies involving themes of sexuality and violence." TR 170. Dr. Castellani stated that, upon discharge, Plaintiff "displayed a mild depression and occasional fantasies, but had notable improvement in her control of the fantasies as well as her depressive symptoms." *Id.* Dr. Castellani instructed Plaintiff to "Continue therapy" and to "Continue the trial of antidepressant medications." *Id.*

On March 4, 1996, Dr. William E. Hardin treated Plaintiff for her complaints of "shooting pain earlier today, left side of head, left lower facial muscles pull to the left" and "Tingling in the left arm and left leg." TR 209. Dr. Hardin reported that Plaintiff was "a bit tearful," and that her "affect [was] blunted." *Id.* Dr. Hardin assessed Plaintiff as having "Certainly higher risk than average for embolic phenomena," and he prescribed "1 aspirin per day." *Id.*

5

On March 29, 1996, Dr. Hardin treated Plaintiff for worsening of her "Extreme depression," suggested that she "Increase Prozac to 20 mg per day," and referred her to a "psychologist at Applewood as I think she needs more talk therapy at this point." *Id.*

On September 4, 1996, Dr. Hardin treated Plaintiff for back pain that she had experienced over the previous six to eight weeks. TR 207. Dr. Hardin observed that Plaintiff had an "atalgic gait on the basis of her back pain" and "discussed at length the possibility of spondyloysis." *Id.*

On November 7, 1996, Dr. Hardin treated Plaintiff for anxiety, depression, and "Binge drinking." TR 206. Dr. Hardin recommended that Plaintiff "call MCC to see counseling through them," and that she "Increase Prozac to 60 mg per day." *Id.*

On January 21, 1997, Dr. Hardin treated Plaintiff for her depression, noting that she was hospitalized at "TN Christian" for an overdose of Xanax three to four weeks prior, and that she had had a seizure four days after she stopped using Xanax. TR 205. Dr. Hardin indicated that Plaintiff was not "definitely suicidal at present," but that she had long standing depression. *Id.* Dr. Hardin diagnosed Plaintiff with "Depression," "Panic disorder," and "Alcohol abuse." *Id.* Dr. Hardin suggested that Plaintiff attend "AA" meetings and he referred her to Dr. Little. *Id.*

On October 19, 1998, Dr. Hardin ordered a "chest PA and lateral" examination of Plaintiff, which revealed "Borderline cardiomegaly with central pulmonary vascular prominence and perihilar interstitial infiltrate." TR 213.

On October 12, 1999, Dr. Hardin treated Plaintiff for complaints of an ear infection, sinus pain, drainage, and back pain. TR 189. Upon physical examination, Dr. Hardin found "No cervical adenopathy." *Id.* Dr. Hardin also found Plaintiff's "DTR's 2+ and equal" and "Negative SLR sitting and supine." *Id.* Dr. Hardin diagnosed Plaintiff with "Mechanical lower

back pain i.e. muscle ligament strain," and prescribed "Back exercises." *Id.*

On February 1, 2000, Dr. Hardin treated Plaintiff for "Pain, tingling, numbness left leg all of same anterior posterior," and "Some radiation of pain down the posterior aspect of the leg into the calf and foot but not clearly into toes, maybe increased with coughing." TR 186. Upon physical examination, Dr. Hardin observed:

> pain in the buttocks with SLR on the left. DTRs are 1+ and equal. Tender to palpation along the left SI joint and over the left sciatic notch. Flexes to about 90 degrees at the waist with increased pain into the calf.

*Id.* Dr. Hardin diagnosed Plaintiff with "Questionable herniated disc versus sciatic nerve root irritation." *Id.* He recommended an "MRI of lumbar spine," "Physical therapy," and "Ibuprofen 800 t.i.d.," and noted "May need nerve conduction studies."[3] *Id.*

On June 14, 2000, Dr. Hardin treated Plaintiff for her acne and noted that she was taking "psychotropic medicines 60 mg. Prozac per day and Effexor 150 mg per day." TR 182. Upon physical examination, Dr. Hardin found that Plaintiff "Looks happier than she has in the past," that she was "More animated," and that she had "No cervical adenopathy." *Id.* Dr. Hardin diagnosed Plaintiff with depression, and prescribed Prozac and Effexor. *Id.*

On September 1, 2000, Dr. Hardin treated Plaintiff for complaints of "mental anguish" and "daily suicidal thoughts." TR 181. Upon physical examination, Dr. Hardin found that Plaintiff was "Obese" and that her "affect [was] very blunted." *Id.* Dr. Hardin concluded that Plaintiff had "Depression, profound, long-standing, chronic," as well as "Chronic nicotine

---

[3]The Record contains a form dated May 2000, that indicates: "This individual 'IS NOT CAPABLE' of managing his/her own funds if awarded benefits." TR 340. (Capitalization original.)

dependence and habitual excessive alcohol consumption." *Id.* Dr. Hardin refilled Plaintiff's prescriptions for Xanax and Effexor, and suggested that she go to a mental health facility if she started to feel "worse." *Id.*

On May 7, 2001, Dr. Hardin treated Plaintiff for her complaint that she was "More anxious," noted that she had stopped taking Prozac, and recorded that she "Did better on Effexor." TR 183. Upon physical examination, Dr. Hardin found that Plaintiff was "alert and oriented" and had "No cyanosis or edema of the lower extremities, particularly noted posterior tibally." *Id.* Dr. Hardin diagnosed Plaintiff with "Depression, chronic, recurrent," and suggested that she continue Xanax and Effexor. *Id.*

On August 3, 2001, Dr. Hardin treated Plaintiff for a sinus infection and pain in her left leg. TR 180. He noted that she had "signs of [a] tender lower back." *Id.* Dr. Hardin concluded that Plaintiff suffered from depression, sinusitis, and sciatica, and he prescribed Xanax and Vioxx. *Id.*

On November 14, 2001, Dr. Rector conducted Plaintiff's "Initial Assessment" at Mental Health Cooperative, Inc. ("MHC"), treating her for her complaint of "OCD and panic and anxiety." TR 337. Dr. Rector indicated that Plaintiff had reported "obsessive symptoms, primarily thinking about doing bad things," which have "disrupted her life and make it difficult for her to concentrate and focus on things she needs to focus on." *Id.* Dr. Rector also indicated that Plaintiff had reported "irritability and easy frustration," that she "gets angry easily,"and that she had "panic symptoms" when "outside or in the presence of strangers." *Id.* He further indicated that she had "depressive symptoms, including trouble sleeping, depressed mood, frustration with her symptoms, and hopelessness." *Id.* With regard to Plaintiff's psychiatric

history, Dr. Rector indicated that Plaintiff had been hospitalized in 1989 and 1997 for "detox" treatment for Xanax and alcohol, and that Plaintiff had reported that Prozac and Anafranil were the most effective medications for her conditions. *Id.* Dr. Rector observed Plaintiff's "fluctuation back and forth between being calm and being tearful," and recorded her report of "some suicidal ideation." TR 338. Dr. Rector's diagnostic impressions were: "Axis I: Obsessive-compulsive Disorder. Panic Disorder. Rule Out Social Phobia. Major Depression, Recurrent, Moderate. Axis II: Deferred. Axis III: Current Pregnancy. Axis IV: Current Pregnancy and Exacerbation Of Psychiatric Illness; Financial Difficulties; Severe. Axis V: GAF: Current, 40; Highest, 50; Lowest, 35." TR 339. Dr. Rector prescribed Prozac, Anafranil, and Xanax, and gave Plaintiff "taper instructions for the Effexor." *Id.*

From November 14, 2001, to January 14, 2003, Dr. Rector treated Plaintiff at MHC for her depression, as well as her inabilities to sleep and to adjust her medications. TR 315-336; 293-298. On December 19, 2001, Plaintiff reported that she had undergone an abortion, after which she began drinking alcohol "quite a bit." TR 334. Dr. Rector determined that Plaintiff's "OCD & Depression" had worsened, adjusted her medications, and added Risperdal. *Id.* On January 16, 2002, Plaintiff reported suicidal ideations, but stated "I can't because of my daughter." TR 333. Dr. Rector adjusted Plaintiff's medications. *Id.*

On March 11, 2002, Dr. Randy Florendo treated Plaintiff for complaints of pain in her sciatic nerve and in the back of her left leg. TR 219.[4] Dr. Florendo noted that Plaintiff had tenderness in her back, and he diagnosed her with "lumbar radiculopathy." *Id.* Dr. Florendo prescribed Vioxx, and suggested that Plaintiff also use Tylenol. *Id.*

_____

[4]Some of the handwritten notes in this record are illegible.

9

On March 20, 2002, Dr. Rector treated Plaintiff at MHC for her complaint of her "insides shaking" and for her OCD, MDD, and panic disorder.  TR 329.  Dr. Rector also noted that Plaintiff had "pain in sciatic nerve," and that her "OCD/Depression is a bit better."  *Id.*

On April 16, 2002, Dr. Rector treated Plaintiff for her complaint that her depression was "worse."  TR 327.  Dr. Rector noted that Plaintiff "Needs therapist."  TR 327.

On April 19, 2002, Dr. Florendo treated Plaintiff for a sinus infection, and noted that Plaintiff had "Anxiety" and "Hypothyroidism."  TR 218.[5]  Dr. Florendo's prescriptions included Vioxx.  *Id.*

On May 23, 2002, Ms. Katrina Hayes completed a "Clinical Intake Assessment" of Plaintiff at Centerstone Community Mental Health Centers ("CCMHC").[6]  TR 305-310.  Ms. Hayes recorded Plaintiff's family history of suicide and alcoholism, and stated that Plaintiff "talks to only sis."  TR 306.  Ms. Hayes noted Plaintiff's problems with her sciatic nerve.  *Id.* Ms. Hayes recorded Plaintiff's "Six month history of prescribed/OTC medications" including Effexor, Prozac, Risperdal, Xanax, Vioxx, and nose spray.  TR 307.  Ms. Hayes indicated that Plaintiff had "Social / Interpersonal" problems, and that she "promised not to kill herself" or her boyfriend, because of her nine year old daughter.  TR 309.  Ms. Hayes observed that Plaintiff's "Mood/Affect" was "Depressed, Anxious, Labile," her "Judgment" was "Poor," and her "Motivation for Treatment" was "Unclear."  TR 310.  Ms. Hayes recommended that Plaintiff

---

[5]Some of the handwritten notes are illegible.

[6]The Record contains a "Memo Progress Note," dated May 23, 2002, in which Ms. Hayes indicated that Plaintiff was being tested for "thyroid problems" and that "wilson's disease is being ruled out -- hi [*sic*] level of copper in your body -- is fatal and causes a mental illness." TR 246.

receive individual therapy, and indicated that Dr. Rector was adjusting Plaintiff's medications. *Id.*

Also on May 23, 2002, Plaintiff underwent a Clinically Related Group ("CRG") assessment.[7] TR 242-244. Plaintiff was assessed as having "marked" limitations in her "activities of daily living" that were characterized by "no motivation to cook and clean," as well as "moderate" limitations in her "interpersonal functioning" that were characterized by her "poor support system." TR 242. It was also noted that Plaintiff "has a CM" and "can't stand being around alot [*sic*] of people." *Id.* Plaintiff was further assessed as having "marked" limitations in "concentration, task performance, and pace" that were characterized by "difficulty w/concentration past aud hallx," as well as "marked" limitations in her "adaptation to change" that were characterized by her inability to "cope w/any stress w/o sui idx." TR 243. Plaintiff's "periods of severe dysfunction" were found to "accumulate to a total of six months duration or longer." *Id.* (Underlining original.) The CRG evaluator indicated that Plaintiff had symptoms of "Group 1 - Persons with Severe and Persistent Mental Illness," and indicated that her GAF was 50. TR 244.

On June 4, 2002, Ms. Hayes treated Plaintiff at CCMHC. TR 248. Ms. Hayes noted that Plaintiff had had an abortion "in 11-01" and that "MDD added to dx at first med follow up, to OCD, and Panic Dis." *Id.* Ms. Hayes also recorded that Plaintiff "Took abt 21 extra Xanax in 11-01." *Id.* Ms. Hayes did not record any change in Plaintiff's treatment or prescription. TR 247-248.

On June 11, 2002, Dr. Rector evaluated Plaintiff using the Tardive Dyskinesia Abnormal

---

[7]The CRG forms do not contain signatures. TR 244.

Involuntary Movement Scale ("AIMS"), and found that Plaintiff manifested none of the symptoms of that condition.  TR 324.

On June 14, 2002, Ms. Hayes treated Plaintiff at CCMHC.  TR 250.  Ms. Hayes recorded Plaintiff's report that her boyfriend was verbally abusive, that he had pushed her off of the bed, and that "she hit the dresser w/her nose and blood went everywhere."  *Id.*  Ms. Hayes recorded that Plaintiff's prescription "was increased (effexor) days ago."  TR 249.

On July 1, 2002, Dr. Jeri L. Lee conducted a "clinical interview and a mental status examination" of Plaintiff on behalf of the Tennessee Disability Determination Services ("DDS").  TR 222.  Dr. Lee stated that Plaintiff was "not considered a honest historian due to exaggeration of symptoms and what appeared to be a feigned presentation of tears and a whining tone."  *Id.*  Dr. Lee noted Plaintiff's complaint that she was unable to work, quoting: "I had a breakdown in 1989 and the shrink says I'm OCD and depressed."  *Id.*  With regard to Plaintiff's mental status, Dr. Lee found that Plaintiff was "alert and cooperative" and "somewhat dysphoric yet not believable."  TR 223.  Dr. Lee further noted that Plaintiff's "affect was appropriate," that her "speech was normal as to rate and quality," and that her "responses were organized."  *Id.*  Dr. Lee stated that Plaintiff reported "auditory hallucinations and homicidal and suicidal ideation yet the report was not credible."  Dr. Lee also reported that Plaintiff wanted to "kill her former employers, her ex-husband and his new wife 'and anybody else who gets in my way.'" *Id.*  Dr. Lee opined that Plaintiff's intelligence was "in the low average range."  *Id.*  Additionally, Dr. Lee recorded Plaintiff's report that she was a victim of sexual abuse as a child, that she could not work because of "OCD," and that she was taking "Prozac, Effexor, Xanax, and Risperdal."  *Id.*  Dr. Lee stated that Plaintiff's daily activities included waking up around 5:00 in the morning and

performing "all the chores around the house," as well as "managing cash, managing a checkbook, driving a car, dressing, bathing, [and] shopping for groceries." TR 224. Dr. Lee recorded Plaintiff's report that she could not "cook meals, remember appointments, do housework, take care of children, get along with people or stick with tasks until they are completed." *Id.* Dr. Lee indicated that Plaintiff's "abilities to understand and remember, to sustain concentration and persistence, to socially interact and to adapt are not believed to be impaired at this time." TR 225. Dr. Lee's diagnostic impressions were: "Axis I: 1. Alcohol abuse by history. 2. Malingering. Axis II: Deferred. Axis III: Irregular menses, rosacea, sinusitis, acne. Axis IV: Loss of custody of her 9-year-old daughter, mother's death 2 years ago, financial stress. Axis V: Current 65, past 65." *Id.*

On July 10, 2002, Dr. Victor A. Pestrak evaluated Plaintiff using the Psychiatric Review Technique Form ("PRTF"). TR 226-238. Dr. Pestrak indicated that Plaintiff had "No Medically Determinable Impairment" (TR 226), that she had "a history of alcohol abuse which is now in remission" (TR 238), and that she was "clearly malingering" (TR 238).[8]

On August 13, 2002, Dr. Rector treated Plaintiff at MHC for her anxiety about "flashes in her head of 'naked children,'" and noted that her "obsessions" were increased. TR 319. Dr. Rector increased Plaintiff's prescription for Risperdal. *Id.*

On September 24, 2002, Ms. Hayes treated Plaintiff at CCMHC. TR 256. Ms. Hayes noted Plaintiff's request to go to the hospital, as well as her denial of suicidal or homicidal tendencies. *Id.* Ms. Hayes noted that Plaintiff was "easily upset," and reported Plaintiff's

---

[8]In Dr. Pestrak's consultant's notes, referring to Plaintiff, he typed: "In the CE he was clearly malingering." TR 238. Plaintiff is female.

complaints that her "hair has been falling out, and she has had chest pains w/numbness in her L arm." *Id.* Ms. Hayes also indicated that Plaintiff's heart was "racing" at 100 beats per minute, and that she was referred to the ER. *Id.* Ms. Hayes concluded that Plaintiff "tried to minimize situation or say that it was only anxiety," and indicated that she would call Plaintiff to "report what ER told her." *Id.* Ms. Hayes referred Plaintiff to Dr. Rector. TR 255.

On October 4, 2002, Plaintiff underwent another CRG assessment.[9] TR 312-314. Plaintiff was assessed as having "marked" limitations in her "activities of daily living" (TR 312), "moderate" limitations in her "interpersonal functioning" (*id.*), "moderate" limitations in "concentration, task performance, and pace" (TR 313), and "marked" limitations in her "adaptation to change" (*id*).[10] Plaintiff's "periods of severe dysfunction" were found to "accumulate to a total of six months duration or longer." TR 313. (Underlining original.) The CRG evaluator indicated that Plaintiff had symptoms of "Group 1 - Persons with Severe and Persistent Mental Illness." TR 314. Plaintiff's then-current GAF was 55, her highest GAF was 60, and her lowest GAF was 45. *Id.*

On October 8, 2002, Dr. Rector treated Plaintiff for her complaint of worsening depression. TR 298. Dr. Rector recorded Plaintiff's report that she was "fatigued" and "lethargic," and indicated that Plaintiff should undergo treatment with regard to the copper in her blood. *Id.*

On October 16, 2002, Ms. Hayes recorded Plaintiff's primary diagnosis of "panic

---

[9]The CRG forms do not contain signatures. TR 314.

[10]Unlike previous CRG evaluations, there were no handwritten comments, but only a reference stating "see progress note 10-24-02." TR 312-313.

14

disorder without agoraphobia" and her secondary diagnosis of "obsessive-compulsive disorder." TR 240.[11]  Ms. Hayes indicated that Plaintiff's additional diagnoses included: "Problems with primary support group," "Problems related to social environment," "Occupational problems," "Housing problems," "Economic problems," and "Other psychosocial & environmental problems." *Id.*  Plaintiff's then-current, highest, and lowest GAF were all found to be 50. *Id.*

On October 24, 2002, Ms. Hayes treated Plaintiff at CCMHC.  TR 299-300.  Ms. Hayes recorded Plaintiff's assertion that she "sleeps too much and has lil energy" and that she was planning to go to a "job interview."  TR 300.  Ms. Hayes noted that Plaintiff "did [not] cook or clean, sleeps most of the time, has times that she does not bathe or get out of bed, ... has difficulty being around people, [and] does some grocery shopping."  TR 299.  Ms. Hayes further noted that Plaintiff had rescheduled her job interview because she was "too fearful," and that she "forgets things in the short term." *Id.*  Ms. Hayes recorded that Plaintiff felt suicidal, that her mother had killed herself in July 2000, and that she had wanted to "harm boss's son at prior job." *Id.*  Ms. Hayes stated that Dr. Rector "refuses to increase prozac." *Id.*

On October 29, 2002, Dr. Rector treated Plaintiff at MHC.  TR 297.  Dr. Rector noted that Plaintiff reported that she continued to sleep "too much," had decreased energy, was obsessively cleaning, and had to "make herself" take a shower. *Id.*  Dr. Rector indicated that Plaintiff's "OCD continues," and she added Zyprexa to Plaintiff's medications. *Id.*

On November 5, 2002, Dr. Edward L. Sachs completed a Residual Functional Capacity ("RFC") Assessment regarding Plaintiff.  TR 257-259.  Dr. Sachs found that Plaintiff was "Moderately Limited" in her abilities to "understand and remember detailed instructions," "carry

---

[11]There is a duplicate of this document at TR 241.

15

out detailed instructions," "maintain attention and concentration for extended periods," "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consise-tent [*sic*] pace without an unreasonable number and length of rest periods," "interact appropriately with the general public," "accept instructions and respond appropriately to criticism from supervisors," "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "respond appropriately to change in the work setting." TR 257-258. Dr. Sachs indicated that Plaintiff could "perform simple and some detailed tasks over full workweek," "interact infrequently or 1-1 with general public and meet basic social demands in work setting," and "adapt to gradual or infrequent changes." TR 259.

Also on November 5, 2002, Dr. Sachs completed a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff. TR 260-273. Dr. Sachs found that Plaintiff had "Affective Disorders" (TR 260) that were evidenced by "Major Depressive Disorder, Recurrent" (TR 263). Dr. Sachs also found that Plaintiff had "Anxiety-Related Disorders" that were evidenced by "Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week" and "Recurrent obsessions or compulsions which are a source of marked distress." TR 265. Dr. Sachs determined that Plaintiff's functional limitations included "Mild" limitations in her "Restriction of Activities of Daily Living," and "Moderate" limitations in her "Difficulties in Maintaining Social Functioning" and her "Difficulties in Maintaining Concentration, Persistence, or Pace." TR 270. Dr. Sachs noted that Plaintiff "exaggerated her symptoms and [was] not fully credible," and that Plaintiff "Can perform ADLs independently." TR 272.

16

On November 10, 2002, Plaintiff underwent another CRG evaluation.[12]  TR 286-289.

Plaintiff was assessed as having "moderate" limitations in her "activities of daily living"; she

was found to sleep "frequently," and to need "some prompting to perform ADL's when sxs.

occur."  TR 287.  Plaintiff manifested "mild" limitations in her "interpersonal functioning"

because she "has [a] poor relationship w/ most family" and "Frequently has conflicts w/

boyfriend."  *Id.*  Plaintiff was also assessed as having "moderate" limitations in "concentration,

task performance, and pace" that were characterized by "frequent difficulty concentrating due to

obsessive thoughts."  TR 288.  Plaintiff was also assessed as having "moderate" limitations in

her "adaptation to change," because she "becomes anxious [and] had sxs when stressful

circumstances occur."  *Id.*  The CRG evaluator indicated that Plaintiff had symptoms of "Group

3 - Persons who are Formerly Severely Impaired," that her then-current and lowest GAF were

50, and that her highest GAF was 55.  TR 289.

On November 25, 2002, Dr. Albert J. Gomez conducted an "abbreviated physical

examination" of Plaintiff on behalf of DDS.  TR 274-275.  Dr. Gomez stated that Plaintiff

complained of "chronic tingling, numbness, and weakness in her left arm for the past three

months without any history of trauma."  TR 274.  Dr. Gomez also recorded Plaintiff's report that

she could perform "very little lifting due to her weakness" and that her "symptoms are increased

with reaching forward and decreased with changing position."  *Id.*  Upon physical examination,

Dr. Gomez found that Plaintiff's left shoulder, elbow, and wrist all had a "full range of motion"

and no "tenderness to palpation."  *Id.*  Dr. Gomez's impression was that Plaintiff had "Chronic

numbness and weakness in her left arm," but that the "Etiology is unclear."  TR 275.

---

[12]The CRG forms do not contain signatures.  TR 289.

On November 26, 2002, Dr. Rector treated Plaintiff at MHC for her complaint that she was "not well" because of "life" and the upcoming holidays. TR 295. Dr. Rector concluded that Plaintiff was "stressed," and suggested that she continue her medications and seek therapy. *Id.* Also on November 26, 2002, Dr. Rector again evaluated Plaintiff using the Tardive Dyskinesia AIMS, and again found that Plaintiff manifested none of the symptoms of that condition. TR 296.

On December 3, 2002, Dr. George W. Bounds completed a form entitled, "Analysis by DDS Medical Consultant." TR 276. Dr. Bounds concluded that Plaintiff had "Physical impairment(s) not severe, singly or combined." *Id.*

The record contains documents from MHC, dated from February 5, 2003, to March 5, 2003, from Dr. Rector or Registered Nurse Penny Gibbs, concerning "Adult Medication Management."[13] TR 290-292. These records indicate that Plaintiff was diagnosed with "Panic disorder without Agoraphobia Secondary" and "Obsessive Compulsive Disorder Primary," which were classified as "Severity Scale: 2." *Id.*

On March 5, 2003, Nurse Gibbs treated Plaintiff at MHC. TR 371. Nurse Gibbs indicated that Plaintiff's diagnoses included: "Major Depressive Disorder Recurrent Mod," "Panic Disorder Without Agoraphobia," and "Obsessive-Compulsive Disorder." *Id.* Nurse Gibbs indicated that Plaintiff was "not doing too bad," that she had "obsessions at about a 7," and that she was "starting appointments with [a] therapist." TR 372.

---

[13]The record also contains a list of medications prescribed by MHC on February 27, 2003 and March 5, 2003. TR 283.

On March 10, 2003, Plaintiff underwent another CRG assessment.[14]  TR 284-286.  The evaluator assessed Plaintiff as having "mild" limitations in her "activities of daily living," noted that she "needs some assistance w/maintain[ing] household," and noted that she "frequently sleeps."  TR 284.  Plaintiff manifested "moderate" limitations in her "interpersonal functioning" because she "isolates" herself at home and has "limited social support."  *Id.*  The evaluator also assessed Plaintiff as having "moderate" limitations in "concentration, task performance, and pace" that were characterized by "difficulty w/concentration due to obsessive thoughts," as well as "mild" limitations in her "adaptation to change" that was characterized by "Little difficulty adjusting to change."  TR 285.  The evaluator indicated that Plaintiff had symptoms of "Group 3 - Persons who are Formerly Severely Impaired," and indicated that her GAF was 50.  TR 286.

On March 24, 2003, Dr. Rector evaluated Plaintiff using a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" Form.  TR 280-282.  Dr. Rector found that Plaintiff manifested "Good" abilities to "Follow work rules," "Relate to co-workers," "Use judgment," and "Function independently."  TR 280.  Dr. Rector also found that Plaintiff had "Fair" abilities to "Interact with supervisors" and "Maintain attention, concentration."  *Id.*  Dr. Rector indicated that Plaintiff had "Poor/None" abilities to "Deal with public" and "Deal with work stresses."  *Id.*  With regard to Plaintiff's abilities to "adjust to a job," Dr. Rector indicated that Plaintiff's ability to follow "Simple job instructions" was "Good," and her ability to follow "Detailed, but not complex job instructions" and "Complex job instructions" was "Fair."  TR 281.  Dr. Rector assessed Plaintiff's ability to make "personal-social adjustments," finding that she had a "Fair" ability to "Maintain personal appearance," and "Poor" abilities to "Behave in an

---

[14]The CRG forms do not contain signatures.  TR 286.

emotionally stable manner," "Relate predictably in social situations," and "Demonstrate reliability." *Id.*

Also, on March 24, 2003, Ms. Hayes recorded Plaintiff's primary diagnosis of "panic disorder without agoraphobia" and her secondary diagnosis of "obsessive-compulsive disorder." TR 311. Ms. Hayes also indicated that Plaintiff's additional diagnoses included: "Problems with primary support group," "Problems related to social environment," "Occupational problems," "Housing problems," "Economic problems," and "Other psychosocial & environmental problems." *Id.* Plaintiff's then-current, highest, and lowest GAF were all found to be 50. *Id.*

On March 27, 2003, Ms. Hayes indicated that she could not complete Plaintiff's "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" form, because it required a physician's signature. TR 279.

On April 2, 2003, Nurse Gibbs recorded that Plaintiff had "had a good time" on vacation, was having "some relationship conflicts," and that her "Anxiety is under control." TR 365-366. Also on April 2, 2003, Dr. Rector treated Plaintiff for her depression, panic attacks, and obsessive compulsive disorder, with no change in her diagnoses. TR 368. Dr. Rector noted Plaintiff's complaint that her medication caused a decrease in her sex drive, and changed her medication to Risperdol. TR 369.

On April 29, 2003, Nurse Gibbs treated Plaintiff for her complaint of anxiety attacks. TR 362. Nurse Gibbs indicated that Plaintiff's diagnoses were expanded to include alcohol abuse. *Id.* Nurse Gibbs recorded Plaintiff's account that she had had a panic attack "in the office" but "was able to contain it," and her report that "Risperdol is helping more with ocd [*sic*] thoughts." TR 363. Nurse Gibbs stated that Plaintiff's treatment plan included switching "neurontin for

20

gabitril." *Id.*

On May 19, 2003, Nurse Gibbs stated that Plaintiff called to notify MHC that she "put herself back on neurontin" because "gabitril has upset her stomach." TR 359-360.

On June 5, 2003, Registered Nurse Fran Parker treated Plaintiff for her complaints of increased "intensity of panic attacks," "depressed mood," and "decrease[d] motivation and anhedonia." TR 354. Nurse Parker indicated that Plaintiff's treatment plan included increasing her dosage of Effexor, adding Xanax, and increasing her dosage of Neurontin. *Id.*

On July 22, 2003, Nurse Parker treated Plaintiff for her complaints of having a panic attack, "seeing bugs that are not there," and agoraphobia. TR 351. Nurse Parker noted that Plaintiff requested Ritalin, and wanted to decrease her dosages of Effexor and Neurontin. *Id.* Nurse Parker noted that Plaintiff's medication requests would be addressed at her next session. *Id.*

On August 13, 2003, Nurse Parker treated Plaintiff for her "increased anxiety and low energy," and again noted her request for Ritalin. TR 343-344. Plaintiff was prescribed Effexor, Xanax, Risperdal, Prozac, and Neurontin. TR 342. Nurse Parker indicated that Plaintiff's treatment plan was to "taper neurontin" and "decrease effexor." TR 344.

On October 3, 2003, MHC issued a "Consumer Face Sheet" that indicated that Plaintiff had "Obsessive-Compulsive Disorder," "Major Depressive Disorder Recurrent Moderate," "Major Depressive Disorder Single Episode Severe Without Psychotic Features," "Panic Disorder Without Agoraphobia," and "Alcohol Abuse." TR 341.

**B. Plaintiff's Testimony**

Plaintiff testified that she was 39 years old at the time of the hearing (TR 46), and that

she has a high school education (TR 60).[15]  Plaintiff reported that her "obsessive-compulsive disorder" and "panic disorder," diagnosed in 1989, were the conditions that prevented her from working.  TR 48.  Plaintiff asserted that she began receiving treatment in 1989, with "Dr. Sam Castellani," and that he had treated her for approximately 10 years.  *Id.*  Plaintiff stated that she was first hospitalized for approximately 10 days in 1989, explaining, "My original mental breakdown was in -- around Labor Day of 1989."  TR 48-49.  Plaintiff testified that she had "had a relapse, a suicide attempt in '97, and I spent about a week in the hospital" (*id.*), but added that she had tried to work during that time (TR 49).  Plaintiff reported that she had started working after high school, and had worked for "that company" for 16 years, but that the company "moved their manufacturing facility to Mexico," after which she started working for another transportation company for two years.  TR 49.  Plaintiff testified that she started having problems when she changed jobs, and that she missed work for her second job "quite a bit."  TR 49-50.  Plaintiff further testified that her mother committed suicide in July 2000, that she "couldn't handle it anymore," and that she "had to quit my job and stay home for a while."  TR 50.

Plaintiff stated that she started working for a "very small company" and that she "really wanted to hurt" the owner of the company.  TR 50.  Plaintiff stated that she was undergoing mental health treatment, and that she indicated to the doctor that she was "actually scared of myself."  TR 51.  Plaintiff testified that she would hide knives from herself, and "put them under lock and key," so that she would not "hurt somebody."  *Id.*  Plaintiff also testified that she

---

[15]Plaintiff's testimony does not address her birthdate, although the record indicates that she was born on April 9, 1964.  *See* TR 107.

"started carrying around an axe handle -- it didn't have an axe end on it, but it had the -- it was just a piece of hickory wood. And I started carrying it around in the car, because I was so angry." TR 52. Plaintiff asserted that she had "missed a lot of work" and that her boss "stayed on me about that quite often, and then I'd get really upset about it." *Id.* Plaintiff testified that her counselor suggested that she should not return to work, and she resigned. *Id.* Plaintiff stated that she had not returned to work "since September of '01." TR 53.

Plaintiff stated that she had "terrible, morbid thoughts," explaining, "my original breakdown, in '89, I started having thoughts of molesting little children, and kidnapping little children and doing stuff to them." TR 53. Plaintiff further testified that, when she told her psychologist about these obsessive thoughts, her psychologist recommended that she go to a hospital for treatment, which she did. TR 54. Plaintiff testified that she started treatment with Dr. Castellani after she went to the hospital, but terminated that treatment because of her insurance limitations. *Id.* She testified that she subsequently began treatment with Dr. Cynthia Rector at Mental Health Cooperative, and that she had sought treatment with Dr. Rector from 2001 until four months prior to the hearing. TR 54-55. Plaintiff reported that she continued to take her medications. TR 55.

Plaintiff testified that she did a "limited amount" of housework, stating: "I just can't seem to get up enough energy to do -- function normally." TR 55. Plaintiff reported that her "three big obstacles" were washing dishes, doing laundry, and making her bed. *Id.* Plaintiff stated that she did not do any other household work, and that her agoraphobia prevented her from leaving the house often. TR 56. Plaintiff also testified:

> getting to the car is the problem, you know, getting -- being able to
> put clothes on -- I have a real problem with getting a shower every

day, getting my teeth brushed every day.  Just doing normal day
activities, just simple, simple little things, you know that just keep
me inside.

*Id.*

Plaintiff stated that she gave her husband full custody of their daughter after her mother
committed suicide, reasoning, "I couldn't take care of myself properly, so I couldn't take care of
her properly."  TR 56-57.  Plaintiff testified that she had bi-monthly visits with her daughter, and
that she would "start getting anxious" on the Friday morning of her visitation weekends.  TR 57.
Plaintiff further testified that she and her daughter would "mostly stay at home."  *Id.*  Plaintiff
also stated that her medications "work fairly well, for the OCD," but that she still experienced
"flashes" that led her to believe that she "might molest her."  TR 58.  Plaintiff testified that, if it
were not for her daughter, suicide would be "a big option."  *Id.*

Plaintiff stated that her medications, including Xanax, made her "quite sleepy," noting, "I
sleep quite a bit during the day."  TR 58.  Plaintiff reported that she did not watch television, and
she added, "I just kind of sit in a room with the coffee and the dog, and dwell."  *Id.*  Plaintiff
stated that she had difficulty keeping appointments.  TR 57-58.  Plaintiff also stated that she did
weekly grocery shopping at Wal-Mart, but that she would have panic attacks while inside the
store.  TR 59.

Plaintiff testified that her first job had been for "a wonderful company" and that she had
worked as a "traffic manager."  TR 60.  Plaintiff stated that her second job had been as a
"transportation supervisor," which was a "dispatcher" position.  *Id.*  Plaintiff asserted that her
third job had required her to "set up the transportation end of the business," and that she "could
not perform the job that they needed" because she was "really going downhill."  TR 61.

24

Plaintiff stated that she lived with her boyfriend, who was an electrician. TR 61. Plaintiff reported that she had taken "six credit hours in college" studying business and physical education, but that she had not taken a psychology course. TR 61-62. Plaintiff testified that her first and second jobs had required her to locate carriers and to match them up with shipments. TR 63. Plaintiff stated that her third job had required her to be the dispatcher and to organize "billing" for the drivers. TR 63-64.

Plaintiff stated that she did not cook, attend social events, or watch television "very often." TR 64. Plaintiff also noted that "Sleep is my retreat" and that she had stopped enjoying hobbies, including taking pictures, cross-stitching, and reading, six years prior to the hearing. TR 65. Plaintiff asserted that she would drive her daughter from Nashville, Tennessee to Portland, Tennessee, which is "about 150 miles," round trip, every other Friday for visitation. TR 65-66. Plaintiff testified that her condition at the time of the hearing was "About the same" as her condition on the previous October, that she smoked "a pack a day," and drank six beers approximately "three or four times a week." TR 66-67. Plaintiff stated that she also drank "about a pot and a half of coffee in the morning." TR 67. She testified that her counselors had told her to stop drinking coffee and alcohol. *Id.*

Plaintiff testified that she had gone to Panama City, Florida in August prior to the hearing, and that she went with her sister "yearly." TR 68. Plaintiff stated that her sister paid for the Florida vacations, and that she would usually "stay in the room" and "sleep a lot." TR 71.

Plaintiff stated that she was not involved in a music group.[16] TR 69. Plaintiff also

---

[16]The ALJ questioned Plaintiff about her possible involvement in a music group, stating "there's something about your being in a music group" "in the notes." TR 69.

testified that she had not worked beyond September of 2001, that she had never been arrested, and that she had never filed for bankruptcy.  *Id.*  Plaintiff testified that she initially filed for disability benefits in 2000, but that she had decided to go back to work.  TR 69-70.

### C.  Testimony of Dusty Key, Case Manager at Mental Health Cooperative

Dusty Key, a case manager with MHC, also appeared and testified.  TR 71.  Ms. Key testified that she was a case manager, not a counselor, that she had a Bachelor's Degree in Psychology, that she was receiving her Master's Degree in Professional Counseling, and that she had "five years experience in mental health."  TR 77.

Ms. Key stated that she was a case manger for persons with "severe and persistent" mental illness: persons who had a "GAF score of 50 or below" or "previous episodes of mental illness," and that she had worked with Plaintiff for "About a year and a half."  TR 72.

Ms. Key described the services that she provided for Plaintiff, which included connecting her with "services in the community," checking to "see how she's doing, see how her medications are doing," and providing "transportation to appointments."  TR 73.  Ms. Key testified that Plaintiff had a "tendency" to "isolate" and would "need verbal prompting."  *Id.*  Ms. Key stated that she would visit Plaintiff in her home twice per month, and that, "she's usually drinking coffee, just kind of -- sometimes, drowsy."  TR 74.  Ms. Key added, "You know, she sometimes complains about just not feeling well, not feeling motivated, you know, to do anything."  *Id.*  Ms. Key stated that Plaintiff lacked motivation and had problems socializing.  *Id.*  Ms. Key testified that Plaintiff would often have trouble being motivated to make appointments, and that she had anxiety about new or unknown situations.  TR 75.  Ms. Key also testified that Plaintiff was "clean, as far as hygiene, things like that, but her dress is usually very -- you know,

just T-shirt, jogging pants, that type thing." *Id.* Ms. Key stated that she had only twice seen Plaintiff fully dressed and wearing make-up. TR 75-76.

The ALJ asked Ms. Key about her practice in filling out CRG forms, as there was a "reference" that Ms. Key had completed a form with Plaintiff. TR 76. Ms. Key initially stated that she did fill out CRG forms. *Id.* Upon further questioning, however, she indicated that this was not her usual practice, and that she had "never completed one, and never been told to complete one, with a consumer." TR 76-77.

### D. Vocational Testimony

Vocational expert ("VE"), Jane Brenton, also testified at Plaintiff's hearing. TR 78. The VE classified Plaintiff's past relevant work as a transportation manager as sedentary and skilled, her past relevant work as a transportation supervisor as light and skilled, and her past relevant work as a dispatcher as sedentary and semi-skilled. TR 78.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 79. Specifically, the ALJ asked the VE to consider limitations from the November 5, 2002 RFC, and added, "In deference to her medications, let's say no ladders, ropes, or scaffolds, and should avoid hazardous machinery and unprotected heights." *Id.* The VE answered that the hypothetical claimant could not perform any of Plaintiff's past relevant work. TR 79-80. The VE added that the hypothetical claimant could perform the past relevant work with "the items listed at moderate," but that the RFC "comments indicate that [Plaintiff] could only perform simple and some detailed tasks," which would eliminate her ability to perform past relevant work. *Id.*

The VE opined that at the light level of exertion, in the State of Tennessee, there were approximately 11,000 assembler positions, 9,300 product inspector positions, and 5,100 hand-packer positions, that would be appropriate for the hypothetical claimant. TR 80. In addition to the available light positions, the VE testified that there were numerous other sedentary positions that would be appropriate for the hypothetical claimant, including 7,000 bookkeeping positions, 1,200 product inspector positions, and 1,000 surveillance system monitor positions. *Id.* In addition to the light and sedentary positions, the VE testified that there were numerous other medium positions that would be appropriate for the hypothetical claimant, including 9,300 assembling positions, 1,600 product inspector positions, and 3,200 hand-packer positions. TR 80-81.

The ALJ asked the VE to assess what "GAF rating" was consistent with the limitations from the November 5, 2002, RFC limitations. TR 81. The VE responded that the RFC was consistent with a GAF in the "Low 50's." *Id.* The ALJ asked if this GAF would be "disabling ... over a long period of time," and the VE responded in the affirmative. *Id.* The ALJ asked the VE if there would be any work for the hypothetical claimant if Plaintiff's testimony was accorded full credibility, and the VE indicated that no work would be available. *Id.*

The ALJ modified the hypothetical, incorporating the limitations from Dr. Rector's March 24, 2003, "Medical Source Statement of Ability To Do Work-Related Activities (Mental)"evaluation. TR 81-82. The VE responded that the hypothetical claimant would not be able to work, particularly because of her "poor" ability to deal with the public, deal with work stresses, behave in an emotionally stable manner, relate predictably, or demonstrate reliability. TR 82-83.

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

30

"listed" impairments[17] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

_____

[17]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ (1) failed to give appropriate weight to the March 24, 2003 Medical Source Statement of Ability to do Work-Related Activities (Mental) assessment of Dr. Rector, Plaintiff's treating psychiatrist, and (2) "improperly discredited" her testimony regarding her subjective complaints.  Docket Entry No. 10.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

32

**1.  Weight Accorded to the March 24, 2003, Assessment of Plaintiff's Treating Psychiatrist**

Plaintiff maintains that the ALJ failed to give appropriate weight to the March 24, 2003

Medical Source Statement of Ability to do Work-Related Activities (Mental) assessment of Dr.

Rector, Plaintiff's treating psychiatrist.  Docket Entry No. 10.

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that

opinion.

     (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Rector's March 24, 2003 Medical Source Statement of Ability to do Work-Related Activities (Mental) assessment found as follows. With regard to Plaintiff's ability to make occupational adjustments, Dr. Rector indicated that Plaintiff had "Good" abilities to "Follow work rules," "Relate to co-workers," "Use judgment," and "Function independently"; "Fair" abilities to "Interact with supervisors" and "Maintain attention and concentration"; and "Poor/None" abilities to "Deal with public" and "Deal with work stresses." TR 280. With regard to Plaintiff's ability to make performance adjustments, Dr. Rector indicated that Plaintiff had a "Good" ability to "Understand, remember and carry out" "Simple job instructions"; and "Fair" abilities to "Understand, remember and carry out" "Complex job instructions" and "Detailed, but not complex, job instructions." TR 281. Finally, with regard to Plaintiff's ability to make personal-social adjustments, Dr. Rector indicated that Plaintiff had a "Fair" ability to "Maintain personal appearance"; and "Poor/None" abilities to "Behave in an emotionally stable

34

manner," "Relate predictably in social situations," and "Demonstrate reliability." TR 281. Dr. Rector did not describe any of Plaintiff's limitations or include any medical or clinical findings to support her assessments.[18] TR 280-282.

Dr. Rector treated Plaintiff for quite some time, a fact that would justify the ALJ's giving greater weight to her opinion than to other opinions. Portions of Dr. Rector's opinion, however, contradict other substantial evidence in the record. As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When physicians' opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

The ALJ in the case at bar accepted those portions of Dr. Rector's Assessment that were consistent with other evidence of record, and rejected those portions of Dr. Rector's Assessment that were inconsistent with other evidence of record. Specifically, the ALJ rejected Dr. Rector's findings that Plaintiff had "Poor/None" abilities to "Deal with public," "Deal with work stresses," "Behave in an emotionally stable manner," "Relate predictably in social situations," and "Demonstrate reliability." The ALJ, in his decision, discussed the evidence of record at length, and demonstrated that Dr. Rector's discounted March 24, 2003 finding were not only

_____

[18]Additionally, Dr. Rector did not provide an answer to the section entitled "Other Work-Related Activities," which states, "State any other work-related activities which are affected by the impairment, and indicate how the activities are affected." TR 282.

Dr. Rector, did, however, indicate that Plaintiff was capable of managing benefits in her own best interest. TR 282.

inconsistent with other evidence of record, but inconsistent with her own treatment notes as well. TR 27-34.

Moreover, as has been noted, Dr. Rector, in her Medical Source Statement of Ability to do Work-Related Activities (Mental) assessment, did not describe any of Plaintiff's limitations or include any medical or clinical findings to support her findings. Because the discounted findings in Dr. Rector's assessment contradict other evidence in the record, the Regulations do not mandate that the ALJ accord Dr. Rector's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

## 2. Subjective Complaints of Pain and Credibility

Plaintiff also contends that the ALJ "improperly discredited" her testimony regarding her subjective complaints. Docket Entry No. 10.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the

36

ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that overall Plaintiff's credibility was "very poor." TR 33. In reaching this determination, the ALJ specifically articulated: "Dr. Lee found the claimant a malingerer and that the claimant reported experiencing every mental health symptom Dr. Lee inquired into and she was greatly exaggerating her symptoms and feigning crying." TR 32. He further noted: "Her activities of daily living as described to Dr. Lee appeared quite good," explaining, "She told Dr. Lee she had no problem managing cash/checkbook, driving a car, dressing, bathing, or shopping for groceries. She stated she did not cook or do housework, get

37

along with people, remember appointments, or complete tasks, but Dr. Lee was very suspicious of this and indicated the claimant seemed to be exaggerating her symptoms." *Id.*

The ALJ also reported that "She recently went to Florida on vacation" and that "she traveled from Portland to Nashville to pick her [daughter] up from school on week-ends," which he noted "is a fairly significant trip that would take more than an hour each way and through city traffic rush hour on Friday," and that "would require good attention." TR 32-33.

The ALJ additionally discussed Plaintiff's smoking, as well as her coffee and alcohol consumption. TR 33. He reported that Plaintiff had "lost her job when the company moved to Mexico," noting that, "She did not quit due to any mental or physical problem," and that she "apparently was not able to find an acceptable job thereafter." *Id.* The ALJ reported that Plaintiff had submitted medication lists, but that "She did not describe any significant side effects to her medication." *Id.* The ALJ discussed Plaintiff's 1989 hospitalization for "nerves," but noted that "she was able to perform at good paying, skilled jobs since that time and only recently began regular therapy." *Id.*

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other

38

evidence.  *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)).  If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

As has been discussed, after assessing all of the objective medical evidence, the ALJ determined that overall Plaintiff's credibility was "very poor."  TR 33.  The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ articulated his rational, and his findings are supported by substantial evidence.  The decision not to accord full credibility to Plaintiff's allegations was proper.  Therefore, this claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's "Motion for Judgment Upon the Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

39

_____

E. CLIFTON KNOWLES
United States Magistrate Judge

40